IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| RICHARD S., | ) | |
| Plaintiff, | ) | Civil Action No. 5:22-cv-00060 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY, | ) | By:   Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Richard S. asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying his application for supplemental security income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. The case is before

me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the

parties' briefs, and the applicable law, I cannot find that the Commissioner's final decision is

supported by substantial evidence.[1] Accordingly, I respectfully recommend that the presiding

District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C.

§ 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

_____

[1] I decline Richard's request for oral argument, Pl.'s Br. 17, ECF No. 17, because the facts and legal
contentions are adequately presented in the materials before the court and a hearing would not aid in the
decisional process.

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4).[2] The claimant bears the burden of

proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to

prove that the claimant is not disabled. *See id.*

## II. Procedural History

In a previous application, Richard protectively filed for SSI on August 25, 2015. *See*

Administrative Record ("R.") 70. An ALJ issued an unfavorable decision on November 20,

2018, R. 70–84, and the Appeals Council denied Richard's request to review the ALJ's decision,

R. 89–91.

Then, Richard protectively filed for SSI again on November 30, 2019. R. 185. He

initially alleged that he became disabled on July 1, 1992, R. 189, but later amended his alleged

onset date to November 30, 2019, R. 40–41. He alleged that he was disabled because of attention

deficit disorder, blindness in his right eye, deformities in both of his feet after multiple surgeries,

numbness in his left arm from elbow to fingertips, the status of his right hand after injury and

surgery, numbness in his right leg from knee to hip, pain in his ankles and feet, low back pain,

and migraines. R. 231. He was thirty-seven years old on his alleged onset date, R. 228, making

him a "younger person" under the regulations. 20 C.F.R. § 416.963(c). Virginia Disability

Determination Services ("DDS") denied Richard's claim initially in September 2020, R. 95–101,

and upon reconsideration in March 2021, R. 105–09. On January 6, 2022, Richard appeared with

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the
date of the Commissioner's final written decision.

counsel and testified by telephone at an administrative hearing before ALJ Jeffrey Schueler. R. 39, 44–58. A vocational expert ("VE") also testified at the hearing. R. 59–64.

ALJ Schueler issued an unfavorable decision on February 28, 2022. R. 18–32. At step one, he found that Richard had not engaged in substantial gainful activity since November 30, 2019. R. 20. At step two, he found that Richard had "severe" medically determinable impairments ("MDIs") of "residual effects of right lower extremity cellulitis and deep vein thrombosis; right eye vision loss; [and] residual effects of hallux valgus surgery." *Id.* Richard's mental MDIs of "polysubstance use disorder, substance-induced mood disorder, and adjustment disorder with anxious traits" were non-severe because they caused "no more than [a] 'mild' limitation in any of the [four broad] functional areas." R. 23; *see* R. 22–23; 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)(1)–(4). At step three, ALJ Schueler found that Richard's severe MDIs did not meet or medically equal the relevant Listings. R. 24–25 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.18, 2.02, 4.11, 4.12, 8.04).

Next, ALJ Schueler determined that Richard had the residual functional capacity ("RFC") to do "light work as defined in" the regulations[3] with additional restrictions that

> he can never climb ladders, ropes, or scaffolds, and frequently crawl; with the right lower extremity, can never operate foot controls; and at least two hours of each day must be in a sitting position. [Richard] needs work with no depth perception required[] and must avoid all exposure to hazards, such as moving machinery or heights.

R. 25 (citing 20 C.F.R. § 416.967(b)). Richard's non-severe mental MDIs did not limit his capacity to sustain unskilled work activities in an ordinary workplace. *See* R. 23–24, 30, 32. At

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). A person who can meet these strength demands can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); *see* SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

step four, the ALJ found that Richard had "a limited education" and no past relevant work. R. 31.
Based on the VE's testimony, ALJ Schueler found that a hypothetical worker with Richard's
RFC and vocational profile could perform certain unskilled "light" occupations (ticket seller and
order caller) that offered a significant number of jobs in the national economy. R. 31–32 (citing
R. 59–61). Accordingly, ALJ Schueler found that Richard was not disabled during the relevant
period. R. 32. The Appeals Council denied Richard's request to review ALJ Schueler's decision,
R. 1, and this appeal followed.

## III. Discussion

Richard challenges the Commissioner's denial of benefits on three grounds. Pl.'s Br. 10–
17. Richard argues that ALJ Schueler's determination that Richard's "adjustment disorder with
anxious traits" was a non-severe mental MDI, his adverse credibility finding as to Richard's
allegedly disabling pain and other symptoms, and his RFC finding that Richard could still do
"light" exertional work despite his lower-extremity pain were not supported by substantial
evidence. *See id.* at 10–12, 13–17.

*A.    Summary*

*1.    Treatment Records*

In October and December 2018, Richard visited the emergency room for an injury to his
right ring finger and follow-up care. R. 281, 572. His gait, strength, and balance were normal, R.
489, and he was able to move "all four extremities through full ROM without pain," R. 282.

Richard was incarcerated on-and-off from late 2018 through August 2020. *See, e.g.*, R.
366, 373–77. On September 10, 2020, he was transported by ambulance to the emergency room
with severe pain in his right leg that started five days earlier. R. 456–57, 473. On examination, he
had normal speech, affect, and mood. His right leg was erythematous, swollen, and painful to

palpation. R. 475. Emergency room personnel diagnosed Richard with cellulitis, found that he

was negative for deep vein thrombosis, and treated him with Toradol and intravenous

Clindamycin. R. 466, 475; *see* R. 532. The attending physician wanted to admit Richard to the

hospital for further observation, but Richard refused because inpatient staff would not let his

wife stay with him overnight. *See* R. 465–66, 539. Richard left the hospital against medical

advice. R. 466.

The next day, Richard returned to the emergency room because his right leg was getting

more painful, swollen, and red. R. 532. On examination, his leg had "[e]xquisite tenderness to

palpation . . . with erythema and swelling," had "[l]imited range of motion secondary to

discomfort of [the] right ankle [and] foot." R. 533. His skin was warm, discolored, and

"concerning for infection." R. 536–37. A venous duplex showed "no evidence of acute deep

venous thrombosis . . . or superficial venous thrombosis." R. 536. Emergency room personnel

started intravenous antibiotics and gave Richard both fentanyl and oxycodone for pain. R. 535,

537, 539, 542. They admitted Richard to the hospital for further intravenous treatment with a

final impression that he had "[c]ellulitis of the right lower extremity." R. 537. On admission,

Richard's leg was "significant[ly]" swollen, tender, and erythematous from knee to ankle, and he

had normal speech and was alerted, oriented, and psychologically "appropriate to [the]

situation." R. 540–41. X-rays of his right tibia and fibula "show[ed] diffuse subcutaneous

edema." R. 547. A CT scan of his right leg showed "mild cellulitis in the anterior and lateral

portion of the mid to distal thigh and moderate cellulitis in the right calf and right foot without

any abscess." R. 551. He also tested positive for hepatitis C and methamphetamine. R. 549.

Medical personnel assessed him with cellulitis in his right leg. R. 547. He remained hospitalized

until September 14, when he left against medical advice, R. 562, "apparently" because he did not

like the visitation policy, R. 549. His right leg was still painful, red, and exhibited "marked

swelling" that was "improving," R. 562, on intravenous antibiotics. *See* R. 559, 561.

In November 2020, Richard visited the emergency department again, this time for pain in

his left leg. R. 523–27 (Nov. 30, 2020). He reported that his left foot had hurt for three weeks, he

had tripped and twisted his left ankle four days earlier, and he "ha[d] been ambulatory with

discomfort." R. 533. On examination, he had "[s]welling inferior to [his] left lateral malleolus

with tenderness to palpation"; full ROM of his left ankle, toes, knee, and hip; and "[d]iffuse

tenderness to [the] dorsum of [his] left foot." R. 524. An x-ray showed hallux valgus, metatarsus

primus varus, metatarsal uncovering of the fibular sesamoid, "[m]ild to moderate arthropathy of

the first MTP joint," "[e]nthesopathy along the base of the fifth metatarsal," and "no acute

fractures or dislocations." R. 526. Emergency room personnel diagnosed an ankle sprain and

discharged Richard with a bandage wrap and crutches. R. 526–27. They noted that he should be

"refer[red] to orthopedics to ensure improvement." R. 526.

On February 23, 2021, Richard visited an urgent care clinic because his right leg was

swollen and painful. R. 583. He reported that "he [wa]s unable to bear weight on that leg," *id.*,

the leg had been swollen "for the last 4 months," the swelling had gotten more painful, and his

leg had become redder, R. 584. An exam of his right leg showed generalized swelling, redness,

warmth with indistinct borders, and tenderness to the anterior lower limb, but no sensory deficit.

R. 586. Urgent care personnel diagnosed Richard with "chronic appearing leg swelling" and

"[c]ellulitis of right anterior lower leg," prescribed Bactrim, and discharged him home. R. 587.

In early June, Richard was arrested and detained at the Botetourt County Jail. *See* R. 378–

82. On June 9, he visited Edwin Polverino, D.O., complaining of left knee pain, R. 385, poor

circulation, and "[a]lligator skin," R. 356. Dr. Polverino examined Richard's knee and noted that

it had full ROM and that Richard had "mild lateral knee soreness with palpation and ROM

testing," "chronic skin changes" on the right ankle and the medial side of the lower leg, and

"[n]o pain behind [the] knees or in [the] calf." *Id.* An x-ray of his left knee showed "[n]o

significant findings." R. 383. Dr. Polverino assessed Richard with knee strain and chronic skin

changes. R. 356.

On June 18, Richard saw Jackie Zeltvay, a physician assistant at the jail, because he

thought he had bipolar disorder. R. 358. He reported that he was depressed and stayed to himself.

*Id.* He had a history of drug use, including heroin, methamphetamine, and marijuana, and he had

attempted suicide twice. *Id.* On examination, he "ma[de] minimal eye contact" and had "fairly

linear" thought process, speech that was "low in volume," "low" affect, and poor judgment. R.

359. His memory was "at times poor for both recent and remote recall," and he had "average

intelligence for [an] 11th grade education." *Id.* Ms. Zeltvay prescribed Sertraline for Richard's

symptoms. *Id.* Richard later reported that this medication "helped a lot" with his mood and

motivation. R. 430 (Dec. 7, 2021).

On September 6, 2021, Richard went to the emergency room because his right leg was

swollen and red. R. 305. On examination, his leg was swollen and had erythema. R. 307.

Emergency room personnel diagnosed cellulitis of the right leg and offered Richard an overnight

stay for observation, but he declined. R. 308. Emergency room personnel discharged Richard

home with a prescription for oral Clindamycin. R. 307–08, 315.

Richard returned to the emergency room on September 8 because the pain and swelling in

his right leg had worsened despite taking Clindamycin as prescribed. R. 309. He could no longer

stand on that leg. R. 315. He reported that he was nauseous and had developed "right-sided

abdominal pain." R. 309. When evaluated, his right leg had "significant swelling and erythema . .

. . [w]ith waxy and translucent appearance of skin." *Id.* The leg was "[e]xquisitely tender . . . even in 'normal['] appearing tissue," and this tenderness extended into Richard's lower abdomen and pelvis. *Id.* He experienced pain "with passive ROM" of his right ankle and knee as well as with "flexion/extension of toes." R. 310. He reported that his third, fourth, and fifth right toes were numb, and he had difficulty moving his right leg and wiggling his right toes. *Id.*

An abdominal CT scan showed "[r]ight iliac and inguinal adenopathy with inflammatory and low-attenuation change possibly reflecting early suppurative adenitis" and no "evidence of frank intra-abdominal pelvic extension of infection." R. 312–13. It also showed that Richard may have had some degree of early thrombophlebitis, but it showed no evidence of deep venous thrombosis. *Id.* A CT scan of Richard's right leg showed "extensive soft tissue induration and subcutaneous fat stranding" and "underlying heterogeneous low-attenuation changes within the lateral calf musculature with subfascial edema without definite underlying organized soft fluid collection and/or soft tissue abscess formation." R. 313. It also showed "[m]arkedly enlarged" popliteal, right inguinal, and right external iliac chain lymph nodes "with many of the lymph nodes demonstrating focal low attenuation change likely reflecting supp[ura]tive adenitis." *Id.* The impression was that Richard had "[c]ellulitis and underlying myositis centered about the right lower extremity with supp[ura]tive adenitis of the underlying lower extremity lymph nodes." *Id.* A physician assistant noted "concern for possible necrotizing soft tissue infection." R. 319. The critical care physician agreed with that assessment. *See* R. 323.

Richard was given broad-spectrum antibiotics and moved to general surgery where he immediately underwent a right leg four-compartment fasciotomy. R. 320–21, 330. The surgeons found "[b]ulging fascial compartments" and a "dusky soleus muscle," but they found "[n]o signs of necrotizing infection." R. 330. Richard was diagnosed with right leg compartment syndrome,

myositis, and cellulitis. *Id.* He remained hospitalized, and on September 10, hospital personnel attempted to close the wounds from his fasciotomy incisions. R. 333. While the medial incision "came together easily," the lateral incision did not, so hospital personnel left it open and covered it with a wound vac. *Id.* The infectious disease staff recommended that Richard stay in the hospital "for at least [a] 2 week course" of antibiotics, followed by another four-week course of oral antibiotics. R. 335. By September 22, Richard's pain was "fairly well controlled," and he was "ambulating the halls freely." *Id.* Hospital social workers made "[s]ignificant attempts" to find a placement for him at a skilled nursing facility for further rehabilitation, but they were unsuccessful. *Id.* On September 22, physicians discharged Richard "[h]ome with assistance" for wound care, R. 342, and instructions not to lift more than fifteen pounds for six weeks after surgery, R. 341. He could do other "activity as tolerated." R. 341.

The next day, Richard was arrested again and detained at Western Virginia Regional Jail. *See* R. 50–51, 391. The jail physician noted that Richard had "weeping drainage" from his incision, but that he could not change the dressing until Richard was "house[d] separately" from other inmates. R. 391. He instructed medical staff to clean and dress Richard's wound twice a day for the next five days, then daily. *See* R. 391. Richard was also assigned to a bottom bunk for several weeks. *See* R. 391, 404. On November 5, jail medical staff determined that Richard was "ambulatory and stable" enough "to accommodate mobility of top bunk and top tier." R. 391. Jail medical personnel cleaned and dressed Richard's wound nearly every day from September 24 to December 21, 2021. *See* R. 392–427, 499–501. Several daily clinic notes indicate that Richard had "[n]o further complaints at th[at] time." R. 393 (Dec. 4); R. 404 (Nov. 5); R. 409 (Oct. 28); R. 415 (Oct. 14); R. 416–19 (Oct. 6–10); R. 422 (Sept. 30); R. 424–26 (Sept. 25–26); R. 499–

500 (Dec. 17–19). The most recent note states that his wound was "healing." R. 499 (Dec. 21).

Richard was still incarcerated as of January 6, 2022. *See* R. 50–51.

On November 1, 2021, Richard saw Kimia McDaniel, a family nurse practitioner, "to discuss trustee eligibility." R. 406. On examination, Richard was alert and able to move all extremities, and he had normal mood and affect; intact, logical, and goal-directed speech; no edema; and "a wound on [the] left leg that [was] healing very well." R. 407. Ms. McDaniel "cleared [Richard] to apply for trustee," but instructed that he should not work in the kitchen because the "wound on [his] left leg . . . can become wet and get infected." R. 407. "All other task[s] such as [l]aundry" would be "OK." *Id.* ("Per provider he may work anywhere but the kitchen.").

On November 15, Denise T. Yopp, a licensed professional counselor, evaluated Richard at his request. R. 438–40. On examination, Richard's speech, mood, affect, thought content, and behavior were appropriate. R. 438–39. His thought form was coherent, his memory was intact, and he was oriented times four. R. 439. His judgment and insight were fair, and he had average intelligence. *Id.* Ms. Yopp planned to conduct a mental health follow-up with Richard. R. 440.

On December 7, Richard had a mental health initial assessment with Ms. Yopp. R. 430–37. Richard reported that he was depressed, felt like he was "going to snap on somebody," had trouble sleeping, had attention deficit hyperactivity disorder ("ADHD"), took special education classes in school, and could not comprehend or pronounce some of the words he read in the Bible. R. 430. Richard's speech, affect, thought content, and behavior were appropriate. R. 435–36. His mood was anxious and depressed, his thought form was coherent and circumstantial, his intelligence was below average, his memory was intact, and his judgment and insight were fair. *Id.* Ms. Yopp's initial diagnostic impression was that Richard had psychoactive substance use

with psychoactive substance use-induced mood disorder, R. 436, and she referred Richard to a psychiatric prescriber, R. 437.

On December 14, Richard had an initial evaluation with Charles Novak, CRNP-PMH. R. 502. Richard reported that he was anxious and depressed, had trouble sleeping, and felt worthless and guilty. *Id.* On examination, his speech, mood, thought content, and behavior were appropriate. R. 504–05. His thought form was coherent, his affect was blunted, his judgment and insight were fair, and his intelligence was below average. *Id.* Mr. Novak noted that Richard had some memory problems and "appear[ed] to have" borderline intellectual functioning. R. 505. He diagnosed Richard with chronic polysubstance use disorder, other psychoactive substance use with psychoactive substance-induced mood disorder, and adjustment disorder with anxious traits, and he prescribed Zoloft. *Id.*

2.   *Medical Opinions*

At the initial level of DDS review in September 2020, Bert Spetzler, M.D., and Louis Perrott, Ph.D., noted that Richard "was scheduled for consultative examinations on" July 15 and 18, 2020, but failed to attend them despite "numerous" attempts to contact him and "his authorized representative." R. 99; *see also* R. 98. Both doctors opined that Richard's file contained "insufficient evidence" to establish the existence of any medically determinable impairments. R. 100; *see* R. 98–99, 102.

At the reconsideration level in February 2021, Donald Williams, M.D., found that Richard had various "severe" MDIs affecting the musculoskeletal system. R. 106–07. He did not have any mental MDIs. *See id.* Dr. Williams opined that Richard could "[o]ccasionally lift and/or carry" twenty pounds; "[f]requently lift and/or carry" ten pounds; "[s]tand and/or walk (with normal breaks)" for about six hours of an eight-hour workday; "[s]it (with normal breaks)" for

about six hours of an eight-hour workday; frequently climb ladders, ropes, and scaffolds; and frequently crawl. R. 107–08. Richard was unlimited in his abilities to climb ramps and stairs, "[p]ush and/or pull" in the upper and lower extremities "other than lift and/or carry," balance, stoop, kneel, and crouch. R. 107. He had no manipulative, visual, communicative, or environmental limitations. R. 108. Dr. Williams determined that "[c]urrent records . . . would indicate that [Richard] [wa]s capable of a light RFC," but the file contained insufficient evidence "to fully evaluate [Richard]'s RFC" because he missed two physical consultative examinations. *See* R. 106, 108. Therefore, he denied Richard's claim based on insufficient evidence. R. 108.

    3.    *Richard's Statements*

    In March 2020, a legal assistant completed an Adult Function Report for Richard based on information he provided via telephone. R. 239–46. Richard cannot "stand for long periods of time," "be around people because of [his] nerves," "work around food" because of his hepatitis C, R. 239, or "move around" like he did before his impairments' onset, R. 240. "[His] feet hurt and swell up[,] and the pain" keeps him from sleeping. *Id.* Richard's impairments affect his ability to walk, climb stairs, squat, kneel, and stand because his knees, feet, and ankles "hurt way too bad[ly]." R. 244. His "ADHD makes it hard for him to concentrate and complete tasks." R. 244, 246. He can walk twenty minutes before he needs to stop and rest for ten minutes, and he can pay attention for one hour. R. 244. While Richard can follow spoken instructions well, he cannot follow written instructions very well. *Id.* He does not get along with authority figures very well and has "been fired or laid off from a job" because of "arguments with others." R. 245. He does not handle stress or changes in routine very well. *Id.*

    As for daily activities, Richard wakes up between noon and 1:00 PM, watches television, "get[s] up and walk[s] around for about [twenty] minutes," continues to watch television,

"sometimes . . . go[es] to his sister's house," and goes to sleep around midnight. R. 239. He also

does some household tasks. R. 241. Two or three times a week, he prepares "simple meals," like

steak or chicken, and he sweeps, mops, and does the dishes. *Id.* These chores take him thirty

minutes, and his fiancé helps him complete them. *Id.* Richard does not take care of any people or

animals. R. 240. He goes outside "at least once a day." R. 242. When he goes out, he rides in the

car or uses public transportation because he "do[es]n't trust [him]self" to drive. *Id.* He "do[es]

not shop." *Id.* He can pay bills, count change, and handle a savings account, but he "do[es]n't

know how to write checks." *Id.* His ability to handle money has not changed since his

impairments' onset. *Id.* As for hobbies and interests, Richard likes to watch television and "work

on bikes with friends." R. 243. He watches television every day and "work[s] on bikes once or

twice a month." *Id.* "Once a month," he spends time with others by "hang[ing] out, watch[ing]

TV, [and] talk[ing]." *Id.* He does not have "any problems getting along with friends, family,

neighbors, or others." R. 244.

    In May 2021, Richard told DDS that the "skin on [his] legs turns black and is like

alligator skin – very scaley and dry." R. 257. His "attention span and comprehension [were]

worse and almost non-existent" compared to his last disability report in November 2020. *Id.* He

had "severe trouble interacting with others because [he was] very moody and snap[s] at

everyone." R. 259.

    On January 6, 2022, Richard testified by telephone at an administrative hearing. R. 39,

44–58. He was still incarcerated at the time. R. 50–51. Richard has an eleventh-grade education.

R. 44. He "tried to" get a GED, but he "couldn't concentrate and [he] do[es]n't understand a

whole lot of things." R. 45. When asked what type of jobs he had attempted to do in the past,

Richard could not "really remember back that far." R. 45. Richard first went to prison for

"[p]ossession of narcotics." R. 50. After his release from prison, he was incarcerated again for "a probation violation." *Id.* Since being incarcerated, he has had a few jobs at the jail. R. 45–46. He worked in the laundry department, but he was "fired because [he] couldn't keep up . . . . [and] didn't really understand" his job duties. *Id.* Then, staff "let [him] do a couple hallway jobs," like sweeping and mopping, but they told Richard that he did not do a "good enough" job. R. 45–46. They also "tr[ied] to have [Richard work] in the kitchen," but when they discovered that he had hepatitis C, "they kicked [him] out of the kitchen." R. 53.

Richard has problems with his right leg. R. 49. At one point, his leg swelled and turned black, requiring surgery in September 2021. R. 51. Since then, his leg has been "numb at the bottom," making it "harder for [him] to walk." *Id.* The wound from the surgery has not healed, so Richard has "about an inch wide cut . . . from [his] knee to [his] ankle." *Id.* He continues to have swelling that "comes and goes" in his right leg, ankle, and foot. R. 51–52. His right leg and ankle are purple, and his right leg hurts. R. 52. He had a blood clot in his leg in 2018. R. 58. Richard also has issues with his feet. R. 52. He had surgeries on both of his feet when he "was still in school." *Id.* He has pain in both feet, and his "right foot his numb at all times." *Id.*

Because of the problems with his feet and right leg, Richard cannot stand or walk "for very long." R. 46. With a cane, he can stand in place for "maybe . . . [twenty] minutes." *Id.* When he tries to continue standing after fifteen or twenty minutes, his knees and feet start to hurt "real bad and [he] fall[s]." *Id.* He can walk for approximately thirty minutes before he needs to rest for ten to twenty minutes. *Id.* Since being incarcerated, it has become harder for Richard to stand. R. 52–53. Because his foot is numb, it is "harder for [him] to walk," and he can no longer run. R. 53. He tried to run at the gym, and he fell. *Id.*

Richard also has vision problems. R. 47–49. He cannot see "[any]thing out of" and has no "light perception" in his right eye. R. 47. He also has vision problems in his left eye and cannot "see five feet in front of [his] face" without his glasses. *Id.* With glasses, he can see twenty or thirty feet. *Id.* Because of his vision issues, Richard struggles to look "forward and down . . . at the same time" and has difficulties walking through "small spaces without tripping." R. 48. He "stumble[s] a lot" and "can[not] walk straight," and his "balance is off." *Id.* Richard "end[s] up tripping over things" and "run[s] into doorways a lot." R. 48–49. He "can balance [him]self to walk, but it's hard," and it is easier for him to balance "if there's something for [him] to hold on[]to" while he walks. *Id.* Because of his vision issues, he could not work as quickly as others in the laundry. R. 49.

Finally, Richard testified about his "mental health issues." R. 54. He has "severe depression, . . . severe bipolar" disorder, and anxiety. *Id.* Because of his depression, Richard "do[es]n't want to do anything" and "do[es]n't want to be around" many people. *Id.* He turned to drug use to "self-medicate" his depression and pain. R. 56–57. His anxiety makes him "nervous around other people." R. 55. He "feel[s] like [he is] losing [his] mind when [he is] around more than . . . three . . . or four people," so he "want[s] to stay to [him]self in [his] room." *Id.* When he is around "more than three or four people," he feels the need to go "somewhere to be by [him]self or away from . . . a lot of people." *Id.* Richard has difficulties with memory and concentration. *Id.* When he tries to read his Bible, he can only read "two small paragraphs" before stopping "because all the words are just starting to blend together." *Id.* He cannot "remember a whole lot of stuff," including what caused his blood clot. R. 58.

16

Richard has additional issues with his physical health. R. 49, 53–54. His hands "go[]
numb sometimes" because of "poor circulation," R. 49, he has untreated hepatitis C, R. 53, and
he has "constant pain" in his lower back, R. 53–54.

B.      The ALJ's Decision

ALJ Schueler determined that Richard's severe MDIs were "residual effects of right
lower extremity cellulitis and deep vein thrombosis; right eye vision loss; [and] residual effects
of hallux valgus surgery." R. 20. He concluded that Richard's "polysubstance use disorder,
substance-induced mood disorder, and adjustment disorder with anxious traits" were non-severe
MDIs because they did "not cause more than minimal limitation in [his] ability to perform basic
mental work activities," R. 22 (citing R. 505), which according to the regulations include things
like following "simple instructions," exercising judgment, responding appropriately to other
people and usual work situations, and dealing with changes in a routine work setting, 20 C.F.R. §
416.922(b)(3)–(6). The ALJ rated Richard's overall degree of limitation in all four broad areas of
mental functioning (the "paragraph B" criteria) in reaching this conclusion. *See* R. 22–23.

First, ALJ Schueler determined that Richard had mild limitation in understanding,
remembering, or applying information. R. 22. The ALJ noted that Richard alleged "problems
with memory and following written instructions[] . . .[,] a history of special education," and an
inability to "comprehend or pronounce some of the words" he reads in the Bible. *Id.* (citing R.
237, 244, 430). Also, some providers noted that Richard "appeared to have borderline
intellectual functioning" and had issues with judgment and memory. *Id.* (citing R. 359, 505).
However, Richard was not diagnosed with borderline intellectual function, *id.* (citing R. 505); a
"provider felt that [Richard's] symptoms were likely related to [his] substance use and
adjustment issues," *id.* (citing R. 503); and "[o]ther treatment notes reflect[ed] normal findings

17

related to this area," including that Richard had "coherent thought form, intact orientation,
average intelligence, intact memory, and fair insight and judgment" as well as an apparently
"grossly intact" mental status, *id.* (citing R. 339, 439, 533, 586).

Second, ALJ Schueler found that Richard had mild limitation in interacting with others.
*Id.* The ALJ noted that Richard alleged "difficulty getting along with authority figures and a
history of losing jobs due to arguments" and "his mood is worse and he snaps at everyone," and
a mental health provider observed that Richard had "soft speech, low affect, and minimal eye
contact." *Id.* (citing R. 245, 257, 359). Nonetheless, the ALJ reasoned that Richard's limitation
was mild because Richard lived in an apartment with his fiancée before being arrested and "other
treatment notes" detailed Richard being calm and appropriate; having a coherent thought form
and appropriate eye contact, tone of voice, speech, mood, thought content, and behavior; and
denying suicidal ideation and hallucinations. R. 22–23 (citing R. 339, 407, 438–39, 475, 504,
533, 586).

Third, ALJ Schueler determined that Richard had mild limitation in concentrating,
persisting, or maintaining pace. R. 23. The ALJ explained that a mental health provider noted
that Richard had "circumstantial thought form," and Richard alleged that he slept poorly and had
"difficulty with concentrating, focusing, and completing tasks." *Id.* (citing R. 244, 430, 436). The
ALJ reasoned that Richard's limitation was mild because "other treatment notes contain[ed] little
or no evidence of functional loss in this area." *Id.* (citing R. 339, 407, 438–39, 475, 504, 533,
586). As examples, the ALJ mentioned notes documenting that Richard "appeared alert and had
intact, logical, and goal-directed speech," *id.* (citing R. 407), and coherent thought form, *id.*
(citing R. 504). The ALJ further reasoned that "[t]here [wa]s . . . evidence that [Richard] c[ould]
perform activities of daily living requiring at least some capability in this area, including

preparing meals and doing routine household chores when living with his fiancée." *Id.* (citing R. 241).

Fourth, ALJ Schueler found that Richard had mild limitation with respect to "adapting or managing oneself." *Id.* Richard alleged "difficulty tolerating stress and changes in routine" and had a "history of substance use and incarceration." *Id.* (citing R. 245, 436). Nonetheless, the ALJ reasoned that Richard's limitation was mild because "treatment notes contain little or no objective evidence of functional loss in this area, such as abnormal grooming, appearance, or behavior." *Id.* (citing R. 339, 407, 438-39, 475, 504, 533, 586). As examples, the ALJ highlighted treatment notes documenting that Richard had coherent thought form and appropriate speech, mood, thought content, and behavior, *id.* (citing R. 504–05); treatment notes showing that Richard "was not depressed and had some mild unspecified anxiety," which was "felt to be likely related to [Richard]'s substance abuse and adjustment issues"; and Richard's report that he had "a good treatment response to Zoloft," *id.* (citing R. 430).

ALJ Schueler then analyzed Richard's physical RFC. *See* R. 25–31. The ALJ discussed Richard's subjective statements, including Richard's written statements and his testimony at the administrative hearing. R. 26. The ALJ found that while Richard's MDIs "could reasonably be expected to cause the alleged symptoms," Richard's "statements concerning the intensity, persistence, and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." R. 27. The ALJ "emphasized that the medical evidence [wa]s only one factor used in evaluating [Richard]'s symptoms" and was "carefully considered along with . . . other factors." R. 29.

ALJ Schueler found that Richard's "allegations regarding his lower extremity problems [we]re partially consistent with other evidence, insofar as the medical evidence of record

documents episodic treatment for acute symptoms." R. 27. "However, the asserted degree of

medical severity and functional loss [was] not entirely consistent with other evidence in the

record, including the acute and episodic nature of [Richard's] lower extremity symptoms." R. 28.

The ALJ "conclude[d] that [Richard] [wa]s restricted to a range of light work that allows

for some sitting and has reduced postural and environmental requirements" as provided in his

own RFC finding "[d]ue to [hi]s recurrent right lower extremity problems and foot problems."

*Id.* (citing R. 25). He explained that Richard's allegations describing more significant functional

limitations, *see* R. 26, were "not entirely consistent" because his lower extremity symptoms were

of an "acute and episodic nature," R. 28; some examinations did not note abnormalities, *id.*

(citing R. 524, 600); in February 2021, a treatment note did not mention "motor weakness or

imbalance" and that day's exam showed "no sensory deficit," *id.* (citing R. 585–86); medical

providers noted Richard's ability to ambulate, *id.* (citing R. 335, 404); Richard's leg wound

"continued to heal and did not have any evidence of infection" in December 2021, *id.* (citing R.

499); Richard "requested to be medically cleared for trustee duty," and the evaluating provider

determined that Richard could not do trustee duty but could do "other tasks like laundry," *id.*

(citing R. 406–07); and there was "evidence of meaningful improvement with treatment," *id.* The

ALJ did not cite any specific evidence in the record to support the last finding. *See* R. 27–29.

Then, ALJ Schueler evaluated the reconsideration level DDS medical opinion in

Richard's record. R. 29. ALJ Schueler found that the DDS "medical consultant's physical

assessment at the reconsideration level of review . . . [wa]s partially persuasive." *Id.* While "[t]he

proposed restriction to light exertion activities was broadly consistent with other evidence," *id.*

(citing R. 107), the assessment was "not entirely supported" because "the medical consultant

noted that there was insufficient evidence to fully evaluate [Richard]'s functioning," *id.* (citing

R. 108). Additionally, the assessment "[wa]s not entirely consistent with other evidence because the totality of the evidence support[ed] greater postural and environmental limitations, considering" Richard's foot, vision, and right leg issues. *Id.*

Finally, ALJ Schueler evaluated the prior ALJ's decision. R. 29–30. ALJ Schueler gave the decision "significant weight overall," but he found that "slightly different limitations [we]re warranted based on new and material evidence." R. 30. He reasoned that "the newer medical evidence of record d[id] not establish any long-lasting change in [Richard]'s overall physical or mental health" and that "newer evidence regarding [Richard]'s lower right extremity problems" warranted "slightly more restrictive postural limitations." *Id.* Furthermore, ALJ Schueler noted that while Richard "took Zoloft off and on beginning in mid-2021," *id.* (citing R. 359, 505–06), and providers noted that Richard's "mental status was somewhat abnormal when he was unmedicated," *id.* (citing R. 389, 434–36), Richard's "mental status appeared grossly intact to providers who evaluated him for other issues," *id.* (citing R. 339, 533, 586). ALJ Schueler did not adopt the previous ALJ's "limitation to 'basic words and instructions.'" *Id.* ALJ Schueler reasoned that "the current medical evidence of record" did not support such a limitation because although "a mental health provider noted that [Richard] appeared to have borderline intellectual functioning, the provider did not diagnose [him] with borderline intellectual functioning or a similar disorder," *id.* (citing R. 505); that provider "felt that the symptoms were likely related to [hi]s substance use and adjustment issues"; and another provider noted that he "had coherent though form, intact orientation, average intelligence, intact memory, and fair insight and judgment," *id.* (citing R. 439). Thus, he was "only 'mildly' limited in understanding, remembering, and applying information." *Id.*

21

ALJ Schueler concluded that Richard could "perform basic work activities as described in the above [RFC] finding" and had "some work-related limitations, but only to the extent described in the . . . [RFC] finding." R. 31.

## C.    Discussion

Richard challenges the ALJ's assessment of non-severe mental impairments, adverse credibility finding, and physical RFC determination. Pl.'s Br. 10–17. As to his mental impairments, Richard argues that ALJ Schueler improperly discounted his statements regarding his "anxiety and depression" based on one provider's belief that Richard's substance use and adjustment disorder caused these symptoms. *Id.* at 10–11. He also asserts, "[t]he evidence of record establishes [hi]s mental impairments impose more than minimal restrictions on his ability to perform work-related activities." *Id.* at 11–12.

Regarding the credibility of his report of physical symptoms and limitations, particularly his pain, Richard argues that ALJ Schueler "employed an improper standard of review regarding [Richard]'s allegations and impermissibly discredited his allegations due to lack of objective findings." *Id.* at 14–16. Richard also argues that the ALJ "failed to build the necessary logical bridge and did not provide a nexus between the evidence and his ultimate conclusion that [Richard]'s allegations are not fully supported." *Id.* at 16–17. On the RFC analysis, Richard argues that ALJ Schueler did not conduct a function-by-function analysis, "provide the narrative discussion required under SSR 96-8p," or "build a logical bridge between the evidence and his physical RFC findings" concerning his abilities to walk and stand and his need for breaks from work. *Id.* at 12–14.

### 1.    Severity of Mental MDIs

At step two, an ALJ must determine whether a claimant has an MDI that is severe or a

combination of MDIs that are severe. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); 20

C.F.R. § 416.920(c). The claimant bears the burdens of proof and production on this issue.

*Bowers v. Colvin*, 628 F. App'x 169, 171 (4th Cir. 2015) (per curiam). "The severity

determination is ultimately 'a threshold question with a de minimis . . . requirement.'" *Moore v.

Colvin*, No. 2:14cv9913, 2015 WL 1481732, at *4 (S.D. W. Va. Mar. 31, 2015) (citing *Felton-

Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011)).

When evaluating mental impairments' severity, an ALJ must use a special technique.

*Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017); *Janet L. v. Saul*,

No. 19-2544, 2021 WL 1733469, at *4 (D. Md. Apr. 30, 2021) (citing 20 C.F.R. §§

404.1520a(c)(2), 416.920a(c)(2)). First, the ALJ must determine whether the claimant has a

medically determinable mental impairment. 20 C.F.R. § 416.920a(b)(1). If the ALJ finds that the

claimant has a medically determinable mental impairment, then the ALJ must "rate the degree of

functional limitation resulting from the impairment[]" in each of "four broad functional areas."

*Id.* § 416.920a(b)(2), (c)(3); *see also Karen Ann G. v. Saul*, No. 19-972, 2020 WL 5369112, at *4

(D. Md. Sept. 8, 2020). These functional areas are: (1) "[u]nderstand, remember, or apply

information"; (2) "interact with others"; (3) "concentrate, persist, or maintain pace"; and (4)

"adapt or manage oneself." 20 C.F.R. § 416.920a(c)(3). The ALJ must rate the claimant's degree

of limitation in each area "us[ing] the following five-point scale: None, mild, moderate, marked,

and extreme." *Id.* § 416.920a(c)(4). If the ALJ determines that the claimant's degree of limitation

in all four areas is "none" or "mild," then the mental impairment is generally considered non-

severe "unless the evidence otherwise indicates that there is more than a minimal limitation in

[the claimant's] ability to do basic work activities." *Karen Ann G.*, 2020 WL 5369112, at *4

(alteration in original) (quoting 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1)). "Basic work activities" are the "abilities and aptitudes necessary to do most jobs," including things like following "simple instructions," "responding appropriately to supervision [and] co-workers," and "dealing with changes in a routine work setting." *See* 20 C.F.R. § 416.922(b).

Here, Richard argues that ALJ Schueler's finding that his mental MDIs were non-severe was not supported by substantial evidence. Richard asserts that ALJ Schueler improperly discounted Richard's statements about his symptoms because he focused on the perceived cause of the symptoms rather than the symptoms or limitations themselves. Pl.'s Br. 11. Richard faults the ALJ for noting a mental health provider's belief that Richard's substance use and adjustment disorder caused his symptoms. *Id.* at 10–11. Reading the ALJ's step-two analysis as a whole, however, reveals that the ALJ did not discount evidence of Richard's symptoms based solely on the provider's belief about the symptoms' cause. Rather, after acknowledging the provider's note that Richard "appeared to have borderline intellectual functioning," the ALJ explained that no healthcare provider had diagnosed Richard with borderline intellectual functioning. R. 22; *see also* R. 30. Then, the ALJ noted the provider's belief about the cause of Richard's symptoms and detailed other conflicting evidence. *Id.* The ALJ discussed Richard's "medically determinable polysubstance use disorder, substance-induced mood disorder, and adjustment disorder with anxious traits," and he accurately summarized the related treatment notes. R. 22. The ALJ then analyzed the medical evidence and reported symptoms relevant to Richard's mental MDIs, and he rated Richard's level of limitation in each of the four functional areas using the requisite scale, explaining why Richard's impairment-related limitations in each functional category were "mild." R. 22–24, 26–27, 30. Thus, the ALJ properly considered the nature of Richard's alleged impairments and the extent of his claimed symptoms and limitations.

Richard also asserts that ALJ Schueler's finding that his mental MDIs were non-severe
was not supported by substantial evidence because "[t]he evidence of record establishes [his]
impairments pose more than minimal restrictions on his ability to perform work[-]related
activities." Pl.'s Br. 12. Richard points out that at different appointments, a provider noted he
appeared to have borderline intellectual functioning, *id.* at 11 (citing R. 504–05); another
provider noted he had low volume speech, low affect, and minimal eye contact, *id.* (citing R.
364); another provider identified he had depressed and anxious mood and below average
intelligence, *id.* (citing 435–36); and multiple providers noted he had memory problems, *id.*
(citing R. 364, 504–05), and fair insight and judgment, *id.* (citing R. 435–36, 504–05). He does
not explain how any of these findings actually impact his work-related mental functioning. *See
generally Felton-Miller*, 459 F. App'x at 229–30 (explaining that although step two presents "a
threshold question with a de minimis severity requirement," "medical conditions alone do not
entitle a claimant to disability benefits; there must be a showing of related functional loss'"
(quoting *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (brackets omitted)).

Moreover, the ALJ acknowledged and considered those exam findings, R. 22–23, and he
concluded that Richard's mental MDIs were non-severe based on other evidence, R. 22. The ALJ
reasoned that Richard reported he lived in an apartment with his fiancée before being arrested,
could prepare meals and do routine household chores when living with his fiancée, R. 23 (citing
R. 241), and had "a good treatment response to Zoloft." *Id.* (citing R. 430). The ALJ further
explained that Richard had not been diagnosed with borderline intellectual function, R. 22 (citing
R. 505), and that providers also noted normal findings, including coherent thought form; intact
orientation and memory; average intelligence, R. 22 (citing R. 339, 439, 533, 586); "intact,
logical, and goal-directed speech," R. 23 (citing R. 407); and appropriate eye contact, tone of

voice, speech, mood, thought content, and behavior, R. 22–23 (citing R. 407, 438–39, 475, 504–05, 533, 586).

ALJ Schueler also acknowledged that a prior ALJ found Richard had non-severe mental MDIs restricting him to work involving "basic words and instructions," R. 30 (citing R. 73–75, 77), and he explained why that specific RFC limitation was not supported by more recent medical evidence showing only "mild" limitations in understanding, remembering, and applying information, *id.* In the end, ALJ Schueler concluded that Richard was not disabled because he still could perform certain "unskilled" occupations existing in the national economy. R. 32. "'Unskilled work' is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 F. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56847, at *4 (Jan. 1, 1985). Here, ALJ Schueler accurately discussed the evidence and adequately explained why it supported his determination that Richard's mental impairments imposed no more than mild restrictions on his ability to meet these demands. *See* R. 22–23, 30.

Richard "has failed to point to *any* specific piece of evidence not considered by the [ALJ] that might have changed" the ALJ's non-severity finding at step two, let alone "the outcome of [Richard's] disability claim" at step five. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Essentially, he asks the Court to revisit the record and find his mental impairments severe. However, courts do not have the authority to reweigh the evidence. *Hancock*, 667 F.3d at

472. The ALJ discussed the evidence supporting his conclusion and the evidence Richard cites, accurately found that medical providers mostly noted normal findings, and reasonably concluded that Richard's mental impairments caused only mild limitations, R. 22–23, 30. Accordingly, I find that the ALJ's determination that Richard's mental impairments were non-severe is supported by substantial evidence.

    2.    *Credibility*

The regulations set out a two-step process for evaluating claimants' symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 416.929. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree" the claimant alleges, *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities." *Lewis*, 858 F.3d at 866. "The second [step] requires the ALJ to assess the credibility of the claimant's [subjective] statements about symptoms and their functional effects," *id.*, after considering all relevant evidence in the record, 20 C.F.R. § 416.929(c). The ALJ's credibility analysis can be critical to a proper RFC determination. *See Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015); *Hines*, 453 F.3d at 565.

An ALJ evaluating a claimant's RFC has broad discretion to decide whether an alleged symptom or limitation is supported by or consistent with other relevant evidence in a claimant's record. *See Hines*, 453 F.3d at 564 n.3; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6

27

(W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). A

reviewing court will uphold the ALJ's credibility determination if his articulated rationale is

legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of

Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Eldeco, Inc. v. NLRB*, 132

F.3d 1007, 1011 (4th Cir. 1997)); *Hines*, 453 F.3d at 565–66.

Richard testified that he has continuing problems with chronic swelling, numbness, skin

discoloration, and severe pain in his right leg; pain and swelling in his feet; and numbness in his

right foot. R. 51–52. These symptoms required surgery, leaving him with a surgical wound that

still had not healed three months later. R. 51. Because of the pain, he struggles to walk, climb

stairs, squat, kneel, stand, and sleep. *See, e.g.*, R. 46, 51–53, 240, 244. He can stand in place for

"maybe . . . 20 minutes" before he begins to experience significant pain in his knees and feet, and

he falls. R. 46.[4] He can walk for about thirty minutes before needing to rest for ten to twenty

minutes. *Id.* Because his foot is numb, he cannot run. R. 53. He also could not work in the

laundry as quickly as others could. R. 48–49.

ALJ Schueler found that the "residual effects of right lower extremity cellulitis and deep

vein thrombosis," R. 20, could reasonably be expected to cause Richard's alleged lower-

extremity symptoms, but that Richard's statements describing the intensity, persistence, and

functionally limiting effects of those symptoms were "not entirely consistent with the medical

and other evidence in the record," R. 27. Richard's "allegations regarding his lower extremity

problems [were] partially consistent with other evidence," but only "insofar as the medical

evidence of record documents episodic treatment for acute symptoms." R. 27. His statements

describing a "degree of medical severity and functional loss" beyond what the ALJ included in

---

[4] Richard also testified that he used a cane. R. 46. No medical records mention Richard's use of an assistive device
for walking.

his RFC finding, on the other hand, were "not entirely consistent with other evidence in the record, including the acute and episodic nature of [his] lower-extremity symptoms." R. 28.

The ALJ reasoned that Richard's statements were "not entirely consistent with evidence" based on the ALJ's own characterization of Richard's symptoms, objective medical evidence and medical-opinion evidence that conflicted with Richard's statements, and a lack of substantiating objective medical evidence. R. 28–29. The ALJ characterized Richard's lower extremity symptoms as "acute and episodic" and having "meaningfully" improved with treatment. R. 28. As examples of medical evidence that conflicted with Richard's subjective complaints, the ALJ pointed to medical providers noting Richard's ability to ambulate, *id.* (citing R. 335, 404), and a February 2021 examination finding of "no sensory deficit," *id.* (citing R. 586). The ALJ also noted an evaluating provider's opinion that Richard could do "tasks like laundry." *Id.* (citing R. 406–07). As for a lack of substantiating medical evidence, the ALJ noted that some examinations did not record abnormalities, R. 28 (citing R. 524, 600); and a note from February 2021 did not mention "motor weakness or imbalance, *id.* (citing R. 585–86).

Richard argues that when finding that his statements were "partially consistent," R. 27–28, ALJ Schueler "employed an improper standard of review" because he "impermissibly discredited [Richard's] allegations due to lack of objective findings," Pl.'s Br. 14–16. While an ALJ "may not reject a claimant's statements about the" intensity, persistence, and limiting effects of his symptoms "solely because [objective] medical evidence does not substantiate the claimant's statements," *Stoker v. Saul*, 833 F. App'x 383, 386 (4th Cir. 2020) (per curiam); *see* 20 C.F.R. § 416.929(c)(2), "the absence of [relevant] objective medical evidence supporting an individual's statements about the intensity and persistence of . . . symptoms is . . . one factor that the adjudicator must consider in assessing an individual's credibility," *Ryman v. Colvin*, No.

29

2:16cv37, 2017 WL 1682588, at *17 (N.D. W. Va. Apr. 17, 2017) (second alteration in original)

(quoting SSR 96-7p, 1996 WL 374186, at *7), *adopted sub nom. Ryman v. Berryhill*, No.

2:16cv37, 2017 WL 1734039 (N.D. W. Va. May 2, 2017). ALJ Schueler did not rely solely on

objective medical evidence when rejecting Richard's statements. He also discussed the nature of

Richard's symptoms, which the ALJ characterized as "acute and episodic" and improving with

treatment; contradictory objective medical evidence; and a medical provider's conclusion in

November 2021 that Richard could do "tasks like laundry. R. 28–29.

      Thus, ALJ Schueler did not question the credibility of Richard's symptoms and reported

limitations solely based on his view of the objective medical evidence. Nonetheless, his analysis

was legally deficient. When making a credibility determination, an ALJ must consider all the

evidence in the record, *Craig*, 76 F.3d at 595 (citing 20 C.F.R. §§ 404.1529(c)(3),

416.929(c)(3)), and must build an "accurate and logical bridge from the evidence to his

conclusion that the claimant's testimony was not credible," *Brown v. Comm'r Soc. Sec. Admin.*,

873 F.3d 251, 269 (4th Cir. 2017) (cleaned up). ALJ Schueler did not build such a bridge.

Although the ALJ correctly acknowledged that Richard's lower extremity problems were

"recurrent," R. 28, he mischaracterized Richard's symptoms as "acute and episodic," R. 28, even

though the evidence shows that they occurred regularly throughout the relevant period. *See, e.g.*,

R. 305–35, 473–75, 532–51, 583–87.

      The ALJ also found that Richard's symptoms improved with treatment. R. 28. That

observation was accurate to a degree, particularly after Richard had emergency leg surgery in

September 2021, but the mere fact of some improvement does not in itself support a finding that

Richard could do "a range of light work" with "some sitting" and "reduced postural and

environmental" demands from November 2019 through February 2022. R. 28, 32. The ALJ's

observation that Richard requested "trustee duty," which was not defined, or a note that Richard voiced no further complaints during his sixth nursing appointment in December 2021 to clean his wound provide little, if any, support for the ALJ's finding of improvement. Furthermore, the ALJ did not explain how this improvement supported his RFC assessment, nor did he marshal any evidence to show the lasting effects of this improvement, considering Richard's open surgical wound and history of regular emergency room visits between September 2020 and September 2021.

ALJ Schueler also found that Richard's reported symptoms and limitations were only "partially consistent" and conflicted with certain objective medical evidence. *See* R. 27–28. However, the objective medical evidence depicted much more significant problems with walking and standing than the ALJ acknowledged. While the ALJ correctly pointed out that medical providers noted Richard "ambulating the halls freely" after his surgery in September 2021, R. 28 (citing R. 335), the ALJ omitted that the same note detailed hospital personnel making "[s]ignificant attempts" to place Richard at a skilled nursing facility for further rehabilitation, R. 335. The ALJ also correctly noted that jail medical staff found Richard to be self-ambulatory with a steady gait in November 2021, R. 28 (citing R. 404), and that a February 2021 examination found "no sensory deficit," *id.* (citing R. 586). However, the objective evidence also shows that Richard has significant leg and foot problems that may limit his abilities to stand and walk. *See, e.g.*, R. 305–35, 473–75, 532–51, 583–87. The ALJ did not explain why or how the two notes about Richard's ability to self-ambulate and one examination finding "no sensory deficit" supported his conclusion about the consistency of Richard's statements, particularly in the face of the other objective medical evidence in the record that aligns with Richard's statements. *See* R. 25–31. Without a fulsome discussion of the conflicting medical evidence,

31

much of which supports Richard's report that he had significant problems walking and standing,

I cannot find that the ALJ built an accurate and logical bridge connecting this objective medical

evidence and his conclusion. *Brown*, 873 F.3d at 269. Accordingly, I find that none of the

reasons for the ALJ's adverse credibility determination are supported by substantial evidence.

    *3.*    *RFC Analysis*

    A claimant's RFC is his "maximum remaining ability to do sustained work activities in

an ordinary work setting" for eight hours a day, five days a week despite his medical

impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis

omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case

record," *Felton-Miller*, 459 F. App'x at 230–31, and it should reflect specific, credibly

established "restrictions caused by medical impairments and their related symptoms" that affect

the claimant's "capacity to do work-related physical and mental activities" on that basis, SSR 96-

8p, 1996 WL 374184, at *1–2. *See Mascio*, 780 F.3d at 637–40. Generally, a reviewing court

will affirm the ALJ's RFC findings when it is clear he considered all the relevant evidence under

the correct legal standards, *see Brown,* 873 F.3d at 268–72, and his written decision builds an

"accurate and logical bridge from that evidence to his conclusion," *Woods v. Berryhill*, 888 F.3d

686, 694 (4th Cir. 2018) (cleaned up), *superseded on other grounds as recognized in Rogers v.

Kijakazi*, 62 F.4th 872 (4th Cir. 2023).

    When assessing a claimant's RFC, an ALJ "must consider all of the claimant's physical

and mental impairments, severe and otherwise, and determine, on a function-by-function basis,

how they affect the claimant's ability to work." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir.

2019) (cleaned up). "In doing so, the ALJ must provide 'a narrative discussion describing how

the evidence supports each conclusion.'" *Id.* (quoting SSR 96-8p, 1996 WL 374184, at *7 (July

2, 1996)). The Fourth Circuit has "rejected a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis" because "remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" *Mascio*, 780 F.3d at 636 (citing *Cichoki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). However, that "does not end [the] inquiry" because "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (alterations in original) (citing *Cichoki*, 729 F.3d at 177). The relevant functions are listed in the regulations; they include physical functions like lifting, carrying, sitting, standing, and walking. *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 387 (4th Cir. 2021) (citing 20 C.F.R. § 416.945(b)). An ALJ cannot "express RFC in exertional levels of work"—such as "light" work or "medium" work—until he or she performs an adequate function-by-function analysis. *Id.*

Here, Richard argues that ALJ Schueler's RFC analysis was not supported by substantial evidence because the ALJ did not conduct a function-by-function analysis, provide the requisite narrative discussion, and "build a logical bridge between the evidence and his physical RFC findings." Pl.'s Br. 12–14. In his RFC analysis, ALJ Schueler evaluated Richard's subjective statements about his symptoms, the DDS medical opinion at the reconsideration level, and the prior ALJ decision. R. 27–29. Then, ALJ Schueler determined that his own RFC finding adequately accommodated Richard's impairment-related limitations. R. 27–28, 31. The ALJ explained that Richard was "restricted to a range of light work that allows for some sitting and has reduced postural and environmental requirements as delineated in the" RFC finding because of Richard's "recurrent right lower extremity problems and foot problems." R. 28.

Although ALJ Schueler evaluated Richard's statements about his symptoms, the DDS medical opinion at the reconsideration level, and the prior ALJ decision, R. 25–31, ALJ Schueler "never explained how he concluded – *based on this evidence* – that [Richard] could actually" meet the exertional requirements of "light work," including "standing and walking for six hours" during an eight-hour workday, *Woods*, 888 F.3d at 694. In fact, the ALJ merely referred to "light work" and did not even state the hour requirements for standing and walking, let alone find that Richard could stand or walk for six hours in an eight-hour workday. *See* R. 25–31. He "expressed [Richard]'s RFC in terms of exertional levels of work without . . . engaging in a function-by-function analysis" of Richard's MDI-related limitations. *Dowling*, 986 F.3d at 388 (cleaned up). These errors preclude meaningful judicial review of the ALJ's RFC finding, requiring reversal and remand.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Richard's motion for summary judgment, ECF No. 16, in part with respect to the adverse credibility finding and RFC analysis, **DENY** Richard's motion for summary judgment in part with respect to the non-severity finding, **DENY** the Commissioner's motion for summary judgment, ECF No. 21, in part with respect to the adverse credibility finding and RFC analysis, **GRANT** the Commissioner's motion for summary judgment in part with respect to the non-severity finding, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such

proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or
specified proposed findings or recommendations to which objection is made. A
judge of the court may accept, reject, or modify, in whole or in part, the findings or
recommendations made by the magistrate judge. The judge may also receive further
evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations
within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is
directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel
of record.

ENTER: February 7, 2024

Joel C. Hoppe
United States Magistrate Judge

35